**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 28, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

GLEN LLEWELLYN,

      Plaintiff–Appellant,

v.

ALLSTATE HOME LOANS, INC.,
d/b/a Allstate Funding; OCWEN
LOAN SERVICING, LLC; NOMURA
CREDIT AND CAPITAL, INC.; NCC
SERVICING, LLC; CASTLE
MEINHOLD & STAWIARSKI, LLC,

      Defendants–Appellees,

and

SHEARSON FINANCIAL
NETWORK, INC.; EQUITY PACIFIC
MORTGAGE, INC.; KEVIN RIDER;
OCWEN FINANCIAL
CORPORATION; NOMURA
SECURITIES INTERNATIONAL,
INC.,

      Defendants.

No. 11-1340

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 1:08-CV-00179-WJM-KLM)**
_____

John N. McNamara of McNamara Law Firm, P.C., Denver, Colorado, for
Plaintiff–Appellant.

Adam C. Goldstein of O'Melveny & Myers, Newport Beach, California (Elizabeth
L. McKeen of O'Melveny & Myers, Newport Beach, California and Mark C.

Willis of Kutak Rock LLP, Denver, Colorado, with him on the brief), for Defendants–Appellees Ocwen Loan Servicing, LLC and Nomura Credit and Capital, Inc.

Phillip A. Vaglica (Christopher T. Groen with him on the brief) of Castle Stawiarski, LLC, Denver, Colorado, for Defendant-Appellee Castle Meinhold & Stawiarski, LLC.

---

Before **KELLY**, **McKAY**, and **HOLMES**, Circuit Judges.

---

**McKAY**, Circuit Judge.

---

Plaintiff Glen Llewellyn filed this action asserting a Fair Debt Collection Practices Act claim, a Fair Credit Reporting Act claim, and a state law outrageous conduct claim against Ocwen Loan Servicing LLC and Nomura Credit and Capital, Inc. (together, the "Ocwen Defendants") based on their alleged credit reporting inaccuracies, and asserting an FDCPA and an outrageous conduct claim against Castle Meinhold & Stawiarski, LLC in connection with foreclosure actions CMS took against Plaintiff. The district court granted summary judgment for the Defendants on each of Plaintiff's claims. Plaintiff now appeals, arguing summary judgment was inappropriate on his FCRA and FDCPA claims.

## BACKGROUND

On March 7, 2006, Plaintiff purchased a property located at 7915 Coolidge Way in Aurora, Colorado, for $559,980. In connection with this purchase, Plaintiff executed a note with Allstate Home Loans, Inc. d/b/a Allstate Funding in

-2-

the amount of $447,984, secured by a deed of trust on the Coolidge property. The loan was funded by Allstate's subsidiary, Equity Pacific Mortgage, Inc., using Allstate's warehouse line of credit. Under the terms of the note, Plaintiff was required to make monthly payments on the loan to EPMI. Plaintiff did so in May 2006, timely making his first monthly payment. Shortly thereafter, NCCI purchased the loan on the secondary market and, on May 15, 2006, transferred the servicing rights to Ocwen, which serviced the loan as the attorney-in-fact for NCCI. On the date of the service transfer, Plaintiff's loan was current.

Prior to the service transfer to Ocwen, Plaintiff had initiated the process of refinancing the loan, ultimately acquiring two refinance mortgage loans on the Coolidge property, totaling $676,000. Plaintiff signed the refinance documents on June 1, 2006, but did not advise the refinance closing agent that the servicing rights had been transferred to Ocwen, despite his awareness of this fact. Plaintiff then spoke with an Ocwen representative on June 5 and incorrectly informed Ocwen that his loan had been refinanced—at the time, he had not yet delivered the required funds to the closing agent. When the Ocwen representative asked Plaintiff for additional details regarding the refinance, he refused to provide any further information. Two days later, Plaintiff delivered to the refinance closing agent the funds he owed to close the transaction. Again, he did not mention Ocwen was servicing the loan that was meant to be refinanced.

On June 14, the closing agent wired the refinancing payoff funds to

Washington Mutual Bank, identifying EPMI (the prior servicer) as the beneficiary. EPMI then wired the funds to Allstate on July 11. From there, it remains unclear what became of the funds. It is undisputed, however, that neither Ocwen nor NCCI ever received the payoff funds as a result of the refinancing transaction.

Ocwen did not receive any payments in connection with the loan in June or July 2006. As a result, Ocwen sent Plaintiff a past-due notice on the loan on July 17 and a letter discussing foreclosure and its alternatives on August 1. Ocwen then, on August 6, provided a negative credit report regarding Plaintiff to a credit reporting agency ("CRA"). In response, Plaintiff called Ocwen on August 7. He informed the Ocwen representative his loan had been refinanced and his new loan was being serviced by Washington Mutual. The Ocwen representative informed Plaintiff that Ocwen had not received any payoff funds and advised him to speak with Washington Mutual to obtain details about the status of the loan. Ocwen then sent Plaintiff another past due notice on August 9 and issued a foreclosure referral to the law firm CMS on August 29.

After receiving the foreclosure referral from Ocwen, CMS sent a debt validation letter to Plaintiff on September 7, informing him that CMS had been retained to commence foreclosure proceedings against the Coolidge property. In the debt validation letter, CMS further advised Plaintiff of the various options available to him if he disputed the debt in question, one of which was to contact

CMS. Plaintiff did precisely that; on September 25, he sent a fax to CMS with a copy of a HUD settlement statement showing that EPMI was to receive the refinancing funds and a letter from Washington Mutual to Plaintiff stating, "If OCWEN was to be paid off during the refinance and was not, please contact your closing agent for research on the payoff wire." (App. at 1217.) After receiving this information, CMS took no further action. Instead, it forwarded the information to Ocwen on October 13. CMS then placed the file on hold on October 18, which action it confirmed with Ocwen on October 19. That same day, CMS sent Plaintiff a letter informing him it had "received [his] recent correspondence disputing the foreclosure proceedings on the [Coolidge] property and ha[d] forwarded such to [its] client, Ocwen," and Ocwen had instructed CMS "to place [its] file on hold pending the outcome of the investigation of [his] dispute." (*Id.* at 177.)

In the meantime and over the course of the following months, several developments took place involving various aspects of Plaintiff's dispute. First, the servicing rights were transferred from Ocwen to NCC Servicing LLC on October 20, 2006. Second, Ocwen received three separate payments from Allstate. The first, in the amount of $7,250.92, was received on September 29. This payment was returned to Allstate as insufficient to cure the then three-month delinquency. The second, in the amount of $3,625.46, was received on October 10. This payment, too, was returned as insufficient to cure the then four-month

delinquency. Ocwen then received a third and final payment in the amount of $10,876.38 on October 23. Because Ocwen was no longer servicing Plaintiff's loan, it forwarded the payment to NCC, the new servicer. Finally, during the months of September and October 2006, Ocwen continued to provide negative credit reports regarding Plaintiff to CRAs. In addition, after the servicing rights had been transferred to NCC, Ocwen confirmed to TransUnion on three occasions that the loan had been service transferred.

As these separate developments were taking place, Plaintiff made several complaints to Ocwen and CMS regarding the disputed debt. He had also obtained the assistance of his mortgage broker, who made several calls to Ocwen on Plaintiff's behalf. In these various communications, Plaintiff provided the HUD settlement statement and the letter from Washington Mutual, and he and his mortgage broker informed Ocwen and CMS the loan had been refinanced and the payoff funds had been transferred to EPMI and/or Allstate. In response, Ocwen began investigating Plaintiff's complaints. Ocwen then, on October 23, received notice from TransUnion, one of the CRAs to which Ocwen reports, that Plaintiff had disputed Ocwen's reports.

During Ocwen's investigation, it requested additional documentation from Plaintiff, including "documents of how the payment was made." (*Id.* at 437.) On November 3 and November 10, the closing agent who handled Plaintiff's refinance sent to NCC and CMS, respectively, a copy of the wire transfer log

reflecting the wire transfer of the payoff funds to EPMI. It does not appear, however, this log was also sent to Ocwen at that time. Ocwen then, on November 13, sent Plaintiff an additional letter explaining the copy of the HUD settlement statement was "insufficient for [Ocwen] to research the issue." (*Id.* at 1236.) Ocwen therefore requested Plaintiff provide it with "the front and back copy of the cashed payoff check, source of receipt along with the letter from your prior servicer stating that the loan was paid in full with them." (*Id.*) In response to Ocwen's request for further proof of the payoff, the closing agent sent the wire transfer log to Ocwen on November 21.

On December 5, CMS sent a letter to Plaintiff advising him "that [its] client has indicated that this loan should have been paid-in-full," and CMS was therefore instructed to "close and bill [its] foreclosure file on this case." (*Id.* at 1487.) CMS further represented that Plaintiff's "credit report will be reversed," and offered that "if [its] client has not fully done so . . . [CMS] will ensure that the problem is addressed." (*Id.*) CMS's foreclosure file was closed in its system two days later, and the certified copy of the deed of trust was returned to NCC. When no further action had been taken to correct the negative credit reports, Plaintiff's counsel sent a letter to CMS on January 22, 2007, requesting CMS have its client address the issue. In response, an NCC representative "writing . . . on behalf of NCC Servicing, LLC.[,] Ocwen Mortgage and Nomura Credit and Capital" sent Plaintiff a letter informing him that "we have requested a correction

to [Plaintiff's] credit." (*Id.* at 1492.) On February 8, when still no further action had been taken, Plaintiff's counsel sent a letter to CMS complaining of Ocwen's failure to correct the negative credit reports. CMS forwarded this letter to NCC, which then sent an email to Ocwen stating, "we are in desperate need of a letter from Ocwen stating that this will be corrected on the borrowers [sic] credit report." (*Id.* at 1497.) Ocwen responded with a letter to Plaintiff dated February 15, which CMS faxed to Plaintiff that same day, in which Ocwen stated it had "requested that the entire reporting trade line be deleted on the loan." (*Id.* at 1537.)

Plaintiff filed his complaint on January 29, 2008, asserting a claim under the FDCPA and a state law outrageous conduct claim against the Ocwen Defendants and CMS as well as a claim under the FCRA against the Ocwen Defendants. On motions by the Defendants, the district court granted summary judgment on each of Plaintiff's claims. It concluded Plaintiff failed to provide evidence of actual damages or willfulness to support his FCRA claim, the Ocwen Defendants are not "debt collectors" under the FDCPA, Plaintiff's FDCPA claim against CMS is barred by the statute of limitations, and the Defendants' actions did not rise to the level of extreme and outrageous conduct required for Plaintiff's outrageous conduct claim. Plaintiff appeals the dismissal of his FCRA and FDCPA claims.

DISCUSSION

"We review a district court's decision to grant summary judgment de novo, applying the same standard as the district court." *Lundstrom v. Romero*, 616 F.3d 1108, 1118 (10th Cir. 2010) (internal quotation marks omitted). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## I. Fair Credit Reporting Act

Plaintiff alleges the Ocwen Defendants violated § 1681s-2(b) of the FCRA. Under this section, a furnisher of information who has received notice of a dispute from a CRA is required to:

> (1) investigate the disputed information; (2) review all relevant information provided by the CRA; (3) report the results of the investigation to the CRA; (4) report the results of the investigation to all other CRAs if the investigation reveals that the information is incomplete or inaccurate; and (5) modify, delete, or permanently block the reporting of the disputed information if it is determined to be inaccurate, incomplete, or unverifiable.

*Pinson v. Equifax Credit Info. Servs., Inc.*, 316 F. App'x 744, 750 (10th Cir. 2009). A consumer is entitled to actual damages for a negligent violation of the FCRA. 15 U.S.C. § 1681o(a). "Under § 1681n(a), however, the consumer need not prove actual damages if the violation is willful, but may recover punitive damages and statutory damages ranging from $100 to $1,000." *Birmingham v. Experian Info. Solutions, Inc.*, 633 F.3d 1006, 1009 (10th Cir. 2011).

The district court granted summary judgment to the Ocwen Defendants,

concluding Plaintiff had failed to provide evidence of actual damages, either economic or emotional, or willfulness to support his FCRA claim. Plaintiff argues each of these conclusions was in error.

*A. Actual Damages*

Plaintiff argues he suffered both economic and emotional damages as a result of the Ocwen Defendants' alleged violation of the FCRA. He maintains he produced sufficient evidence in response to the Ocwen Defendants' motion for summary judgment to create at least a genuine dispute as to the existence of such damages and whether they were caused by the Ocwen Defendants' alleged FCRA violation.

We turn first to Plaintiff's alleged economic damages. Specifically, he claims the Ocwen Defendants' negative credit reporting ruined his credit and precluded him from obtaining further loans. Because the appropriateness of summary judgment turns on the existence, or non-existence, of a factual dispute, we discuss each piece of evidence Plaintiff has offered to support these two claims.

First, Plaintiff claims the Ocwen Defendants' actions ruined his credit score. To rebut this argument, the Ocwen Defendants submitted two credit reports for Plaintiff, each containing a credit score from the three credit bureaus. The first report, issued on May 16, 2006 (the day after the Ocwen Defendants acquired Plaintiff's loan), shows credit scores of 637, 605, and 631, which

average to 624. The second report, issued on December 8, 2006, shows credit scores of 668, 564, and 631, which average to 621—only a three-point difference from the May 2006 report. Notably, in response, Plaintiff did not cite to any other credit reports to support his contention his credit had been ruined. Rather, he relied on statements made by his broker, his accountant, and Michael Barron, the former CEO of the parent company of Defendant Allstate Home Loans, Inc.

Specifically, Plaintiff pointed to his broker's description of the Ocwen Defendants' actions as "totally screwing [Plaintiff's] credit." (App. at 1307.) He similarly relied on Mr. Barron's statement that Plaintiff's credit was "terrible." (*Id.* at 1594.) The only evidence he offered of a decrease in his credit score comes from his broker and his accountant. According to his broker, "At no point did [Plaintiff's] credit score only drop by three points . . . ; in fact, his credit scores fell by nearly one hundred points because of Ocwen."[1] (*Id.* at 1637.)

---

[1] Plaintiff's broker had previously testified during her deposition that Plaintiff's "scores fall [sic] from 780 to down below 600 because of one mortgage late." (*Id.* at 1278.) The full exchange was as follows:

Q:   When you say you reviewed [your file on Plaintiff] for a year, do you mean since the action started, or back in the application phase you were involved in it for a year?

A:   No. After the loan closed and when I was going to do another loan for Mr. Llewellyn, Ocwen showed one times 30 days late. His scores fall [sic] from 780 to down below 600 because of one mortgage late. So I said, What is Ocwen? We had nothing from Ocwen. So -- ."

(*Id.*) When read in context, Plaintiff's broker's testimony is less than clear.

(continued...)

Plaintiff's accountant similarly stated, "Mr. Llewellyn told me his credit rating with the three major credit bureaus dipped over 100 points by the beginning of 2007 as compared to spring, 2006." (*Id.* at 1258.)

These pieces of evidence, however, do not create a genuine dispute as to whether the Ocwen Defendants' actions ruined Plaintiff's credit score. A review of the statements made by Plaintiff's accountant and Mr. Barron reveals they are inadmissible hearsay and therefore cannot support Plaintiff's opposition to summary judgment. *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1314 (10th Cir. 2005) ("Hearsay testimony that would not be admissible at trial is not sufficient to defeat a motion for summary judgment."). The statement made by Plaintiff's accountant makes clear he was merely recounting Plaintiff's own statement that his credit score had fallen 100 points. Similarly, Mr. Barron was unequivocal in his deposition that he "didn't see [Plaintiff's] credit report." (App. at 1597.) Mr. Barron readily admitted he "didn't know anything at all except what [Plaintiff's counsel] told [him] about it." (*Id.* at 1598.) Plaintiff is then left only with his broker's statements that the Ocwen Defendants "screwed"

---

[1](...continued)
Plaintiff does not cite to any further deposition testimony in which his broker identified the time-frame or "mortgage late" to which she was referring in order to specifically tie the alleged drop in Plaintiff's credit score to the Ocwen Defendants' negative credit reporting. Without such information, we cannot infer that Plaintiff's credit score ultimately fell from 780 to below 600, an allegation for which Plaintiff provided no other evidence, as a result of the Ocwen Defendants' alleged violation of the FCRA.

with his credit and that his credit score fell nearly 100 points. However, such "[u]nsupported conclusory allegations . . . do not create an issue of fact." *MacKenzie v. City & Cnty. of Denver*, 414 F.3d 1266, 1273 (10th Cir. 2005). Plaintiff has therefore failed to create a genuine dispute as to whether the Ocwen Defendants' alleged violation of the FCRA negatively affected his credit.

Plaintiff additionally argues the Ocwen Defendants' actions prevented him from obtaining further refinance loans, which were critical to his business. In their motion for summary judgment, the Ocwen Defendants noted there was no evidence Plaintiff had submitted a single formal loan application that had been denied. In response, Plaintiff pointed to statements made by his broker and accountant, as well as himself, regarding his inability to obtain further loans. He additionally relied on Mr. Barron's inability to obtain a refinance loan for his property at a 100% loan-to-value ratio. We address each of these pieces of evidence in turn.

According to Plaintiff, "[w]hen [his] credit was ruined, [he] could no longer borrow or acquire new properties to scrape, fix up, rent, or sell at a profit to pay the loans against the properties." (App. at 1207.) Plaintiff's broker similarly stated Plaintiff "could not get any more loans to purchase more properties from at least September, 2006, through March, 2007 to keep his real estate investment portfolio strong." (*Id.* at 1637.) His accountant likewise concluded Plaintiff was "unable to generate income [in the fall of 2006] because

-13-

of his ruined credit and inability to procure loans." (*Id.* at 1259.) However, neither Plaintiff, nor his broker, nor his accountant provided any evidence Plaintiff had applied for, and been denied, additional loans. To the contrary, Plaintiff's broker testified that after Plaintiff refinanced the Coolidge property, he did not submit an application for a home purchase or refinance mortgage loan through her, her company, or her associates. (*Id.* at 1303-04.)

Plaintiff did point to one instance in which Mr. Barron was unable to obtain a refinance loan on Plaintiff's properties at a 100% loan-to-value ratio. As Mr. Barron explained during his deposition, he offered, at Plaintiff's counsel's request and in response to the threat of a lawsuit, to "see if there's anything we can do for Mr. Llewellyn" (*id.* at 1594), specifically to "see if we can refinance the loan" (*id.* at 1595). However, Mr. Barron was unable to offer Plaintiff a refinance loan at the loan-to-value ratio Plaintiff had wanted. Plaintiff relied on an email sent to Mr. Barron to demonstrate this was because of the Ocwen Defendants' negative credit reporting. In the email, an employee informed Mr. Barron that Plaintiff "is looking for a 100%CLTV on all his properties" but "unfortunately with his multiple 30 day lates, his current FICO and of course major changes in the marketplace [70 or 80% loan-to-value] is the very best we could do at this point." (*Id.* at 1628.) Mr. Barron confirmed this is what the email said, but did not provide any further details on why he was unable to offer Plaintiff a 100% loan-to-value refinance. He did, however, acknowledge that in early 2007 "[s]ubprime

loans were unable to be sold effectively or par or above."  (*Id.* at 1623.)

Plaintiff argues the reference in the email to Plaintiff's "multiple 30 day lates" and "his current FICO" are sufficient to create a genuine issue as to whether his inability to obtain the 100% loan-to-value refinance was caused by the Ocwen Defendants' negative credit reporting.  However, the only evidence Plaintiff submitted to show these factors at least contributed to the offer of only 70 to 80% loan-to-value refinancing was the email itself.  Because Plaintiff offers the employee's statement contained in the email to prove the truth of the matter asserted in that statement—the cause of the denial—it is inadmissible hearsay. Fed. R. Evid. 801(c), 802.  As we previously discussed, such hearsay statements may not be considered in support of Plaintiff's opposition to summary judgment. *See Jaramillo*, 427 F.3d at 1314.  Without the explanation for why Mr. Barron could not offer Plaintiff a refinance loan at a 100% loan-to-value ratio, we are unable to infer that the Ocwen Defendants' negative credit reporting precluded Plaintiff from obtaining further loans as he contends.

Although he presents much argument on the issue, Plaintiff has failed to point to specific admissible evidence to support his claim that he has suffered economic damages as a result of the Ocwen Defendants' alleged violation of the FCRA.  "We stress that [Plaintiff] had the affirmative duty of coming forward with evidence supporting his claim that [the Ocwen Defendants'] alleged inaccurate report caused him harm." *Cahlin v. Gen. Motors Acceptance Corp.*,

936 F.2d 1151, 1161 (11th Cir. 1991). "Despite more than adequate opportunity for discovery, he has failed to meet this burden, and the district court's grant of summary judgment in favor of [the Ocwen Defendants] must be affirmed on this basis." *Id.*

We turn now to Plaintiff's claim that he suffered emotional damages as a result of the Ocwen Defendants' alleged violation of the FCRA. In their motion for summary judgment, the Ocwen Defendants argued Plaintiff failed to produce any evidence to support this claim. In response, Plaintiff submitted his own affidavit and records from medical evaluations that took place in 2009. In his affidavit, Plaintiff explained that before the Ocwen Defendants began issuing negative credit reports, his preexisting Crohn's disease and depression were under control. He specifically stated he no longer needed any medication for his depression, he experienced no Crohn's-related symptoms, and he was otherwise quite healthy, with a stamina unmatched by his coworkers. (App. at 1204.) Then, in approximately August 2006, Plaintiff discovered the Ocwen Defendants had issued negative credit reports in connection with the Coolidge property loan. As a result of this discovery, Plaintiff's "health began to rapidly deteriorate" with symptoms of his Crohn's disease "return[ing] with great force." (*Id.* at 1205.) In addition, Plaintiff began to "experience severe abdominal pain with stomach and intestinal cramping, along with bloating, constipation, diarrhea, and reoccurring nausea" as well as "drenching night sweats, panic attacks, anxiety, severe kidney

pains, horrible joint pains at [his] wrists, neck, hips, jaw, spine, and knees, and low grade fevers and chills."[2] (*Id.* at 1205-06.) He further experienced "great stress and anxiety" in response to the various written communications he received from the Ocwen Defendants and CMS. (*Id.* at 1206.) These increased health problems led to a return of Plaintiff's depression and a feeling that he "could not recover." (*Id.*)

The Ocwen Defendants contend Plaintiff's affidavit, without more, is insufficient to create a genuine dispute as to whether their actions *caused* Plaintiff to suffer emotional damages. They rely on the requirement imposed by several of our sister circuits that plaintiffs who rely on their own testimony to establish emotional harm must "explain [their] injury in reasonable detail and not rely on conclusory statements, unless the facts underlying the case are so inherently degrading that it would be reasonable to infer that a person would suffer emotional distress from the defendant's action." *Bagby v. Experian Info. Solutions, Inc.*, 162 F. App'x 600, 605 (7th Cir. 2006) (internal quotation marks omitted); *see also Ross v. FDIC*, 625 F.3d 808, 818 (4th Cir. 2010). The Ocwen Defendants argue Plaintiff failed to provide anything other than "conclusory and uncorroborated statements" that they, opposed to other stressful events in Plaintiff's life at the time, caused his emotional distress. (Ocwen Defs.' Answer

---

[2] Plaintiff additionally suffered other symptoms that led a doctor to "immediately diagnose[]" Plaintiff with diabetes. (*Id.*) Plaintiff does not appear to argue the Ocwen Defendants' actions caused or contributed to his diabetes.

Br. at 33.)

Viewing Plaintiff's affidavit in the light most favorable to him and drawing all reasonable inferences in his favor, as we must, we conclude Plaintiff has provided sufficient evidence he suffered emotional damages as a result of the Ocwen Defendants' actions. *See Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 242 (4th Cir. 2009) (concluding the plaintiff "sufficiently articulated and demonstrated the emotional distress she experienced as she attempted to correct [the credit reporting service's] errors" where she "presented evidence that her mental distress manifested itself as headaches, sleeplessness, skin acne, upset stomach, and hair loss"). We agree that in relying on his own testimony, Plaintiff was required to "explain [his] injury in reasonable detail and not rely on conclusory statements," *Bagby*, 162 F. App'x at 605 (internal quotation marks omitted), and conclude he has done precisely that. Plaintiff detailed the state of his health prior to the Ocwen Defendants' negative reporting, including the dormancy of his pre-existing conditions; he identified his discovery of the Ocwen Defendants' negative credit reports as the event precipitating the deterioration of his health; and he described, in great detail, the stress, anxiety, and physical symptoms he experienced after learning of the negative reports and the effect they had on his Crohn's disease and depression. Plaintiff's attribution of his symptoms and the deterioration of his health to the Ocwen Defendants' actions is

not so incredible or conclusory we can ignore it.[3]  It is reasonable to infer from the aggravation of Plaintiff's previously managed conditions and the development of several new symptoms at precisely the time Plaintiff discovered the negative reports on his credit report that the Ocwen Defendants' actions caused these forms of emotional damages.  This inference is no less reasonable simply because Plaintiff was diagnosed with diabetes and experienced other stressful life events (including several foreclosures) during the same time period.  *See Bach v. First Union Nat'l Bank*, 149 F. App'x 354, 362 (6th Cir. 2005) (concluding that although a stroke suffered by plaintiff during the same time as the FCRA violation "was clearly not a result of [the] violation, the fact that [the plaintiff] had suffered a stroke [was] pertinent to the circumstances surrounding [her] emotional distress").

Contrary to the Ocwen Defendants' assertion, Plaintiff was not required to produce evidence to corroborate his detailed and specific testimony in order to

---

[3] We acknowledge that Plaintiff's description of the damages he suffered includes several physical symptoms in addition to forms of emotional distress.  At trial, Plaintiff's ability to recover for the various physical symptoms he describes will turn, in part, on his ability to establish that the physical symptoms are manifestations of the emotional distress he experienced.  At this stage, however, it is sufficient that Plaintiff presented a detailed description of various manifestations of emotional distress he allegedly experienced as a result of the Ocwen Defendants' actions.  These include, but are not limited to, "drenching night sweats, panic attacks," "great stress and anxiety," and the feeling he "could not recover."  (App. at 1205-06.)  Plaintiff's ability to seek damages for the other various physical symptoms will be more appropriately addressed by the district court through pre-trial and trial motions.

survive summary judgment.  Although several of our sister circuits require a plaintiff to describe his or her emotional distress "in reasonable detail," *Bagby*, 162 F. App'x at 605 (internal quotation marks omitted), the Ocwen Defendants have not pointed to, nor have we found, any circuit that additionally requires corroborating evidence.  As the Sixth Circuit explained, "An injured person's testimony *alone* may suffice to establish damages for emotional distress provided that she reasonably and sufficiently explains the circumstances surrounding the injury and does not rely on mere conclusory statements." *Bach*, 149 F. App'x at 361 (emphasis added).  Plaintiff described the circumstances surrounding his injury in reasonable and sufficient detail that he was not required to produce further evidence of his emotional distress.  We conclude that his affidavit alone created a genuine dispute as to whether the Ocwen Defendants' actions caused him to suffer emotional damages.

### B. Willful Violation

Plaintiff contends that, in addition to his actual damages, he is entitled to recover statutory and punitive damages under 15 U.S.C. § 1681n because the Ocwen Defendants willfully violated the FCRA.  "A 'willful' violation is either an intentional violation or a violation committed by an agency in reckless disregard of its duties under the FCRA." *Birmingham*, 633 F.3d at 1010.  "Recklessness is measured by 'an objective standard:  action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be

known.'" *Id.* (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68 (2007)). "'[A] company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.'" *Id.* (quoting *Safeco*, 551 U.S. at 69) (alterations in original). The district court concluded that, although there was a genuine dispute as to whether the Ocwen Defendants violated the FCRA, Plaintiff had failed to present evidence that any such violation was willful.

Plaintiff argues he provided evidence from which a jury could infer the Ocwen Defendants willfully violated the FCRA in failing to remove their negative credit reports until February 15, 2007—nearly four months after their investigation obligations under § 1681s-2(b) were triggered. In support of this argument, Plaintiff relies on the December 5, 2006, letter written by CMS, in which CMS stated "that [its] client has indicated that this loan should have been paid-in-full." (App. at 1487.) He argues this letter represents the Ocwen Defendants' acknowledgment that the negative credit reports were in error and contends that once the Ocwen Defendants acknowledged this fact, their delay in removing the negative reports was willful. Before we reach Plaintiff's argument that any delay after the Ocwen Defendants admitted the reports were in error constitutes willfulness, we must first consider whether the December 5 letter can,

in fact, be considered an admission by the Ocwen Defendants.

Notably, in its December 5 letter, CMS does not identify the "client" to which it refers. Plaintiff argues the client must be Ocwen because it was the only entity that had provided negative credit reports to the CRAs. However, Plaintiff's argument is directly contradicted by the sworn statement of Deanne Stodden, a CMS attorney, that "[o]n December 5, 2006, CMS was instructed to close its foreclosure file by *the new servicer, NCC Servicing*." (*Id.* at 119 (emphasis added).) Further contradicting Plaintiff's argument is CMS's refusal to revise the December 5 letter "to reflect that Ocwen was the client," as requested by Plaintiff's counsel. (*Id.* at 119-20.) Rather than do so, and "solely as an accommodation to [Plaintiff's counsel's] specific request," CMS rewrote the December 5 letter and informed Plaintiff's counsel that "CMS currently represented NCC Servicing, LLC." (*Id.* at 120.) The revised letter, written on January 18, 2007, reflects the same. (*Id.* at 181 ("Please be advised that this firm currently represents NCC Servicing, LLC. . . . .").) Plaintiff does not cite to any evidence to support his conflicting interpretation of the December 5 letter. Rather, he maintains a jury could infer from the fact that Ocwen initially retained CMS that it was the "client" to which CMS referred on December 5.

Even viewing the evidence in the light most favorable to Plaintiff, we conclude Plaintiff has failed to create a genuine dispute as to the identity of the "client" mentioned in CMS's December 5 letter. The Ocwen Defendants

presented testimony and correspondence with Plaintiff's counsel demonstrating that NCC, and not Ocwen, was CMS's client as of December 5, 2006. Plaintiff asks us to essentially ignore this evidence and infer from CMS's initial representation of Ocwen that CMS's December 5 letter referred to Ocwen. Given the evidence, this inference is not a reasonable one. We are therefore not required to make it in Plaintiff's favor. *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1276 (10th Cir. 2008). Because Plaintiff has not shown the Ocwen Defendants admitted through CMS's December 5 letter that the negative credit reports were in error, we need not consider Plaintiff's argument that their subsequent delay in removing the reports was willful.

To further support his claim of a willful violation, Plaintiff points generally to the Ocwen Defendants' failure to consider pertinent information they had available when the investigation obligations triggered and information they obtained during the subsequent investigation. He specifically refers to his own representations that his loan had been refinanced, the HUD Settlement Statement showing the payoff was to be made to EPMI, the Washington Mutual letter confirming payoff funds were sent to EPMI, and the partial payments the Ocwen Defendants received from Allstate. He argues these documents and representations alerted the Ocwen Defendants the loan had been refinanced and their failure to immediately remove the negative reporting based on this information was willful.

Although Plaintiff's evidence supports his assertion that the Ocwen Defendants "moved slowly in completing [their] investigation and [were] negligent in [their] compliance with the prompt deletion requirement," "[t]he record does not reveal . . . any intention to thwart consciously [Plaintiff's] right to have inaccurate information removed promptly from his report." *Stevenson v. TRW Inc.*, 987 F.2d 288, 294 (5th Cir. 1993) (concluding the district court's finding of willful noncompliance was clearly erroneous). As in *Birmingham*, in which we held the defendant was entitled to summary judgment on the plaintiff's willful violation claim, "we have been pointed to no described practice that would be a reckless violation of the FCRA." 633 F.3d at 1012. Nor has Plaintiff provided any evidence the Ocwen Defendants' standard procedures were unreasonable. *See id.* At most, he offers evidence that the Ocwen Defendants negligently violated their § 1681s-2 obligations. This is insufficient to support a claim under § 1681n for a willful violation of the FCRA. *See Birmingham*, 633 F.3d at 1012 (affirming grant of summary judgment to defendant on issue of willfulness because there was "no evidence that [defendant's] specific actions with respect to [plaintiff] were reckless"); *Philbin v. Trans Union Corp.*, 101 F.3d 957, 970 (3d Cir. 1996), *abrogated on other grounds by Cortez v. Trans Union*, 617 F.3d 688 (3d Cir. 2010) (affirming grant of summary judgment to defendant on issue of willfulness because evidence that plaintiff notified defendant of an error and defendant failed to correct the error "falls short of evidence of a willful

-24-

violation"); *Casella v. Equifax Credit Info. Servs.*, 56 F.3d 469, 476 (2d Cir. 1995) (affirming grant of summary judgment to defendant on issue of willfulness because plaintiff "presented no evidence that either [defendant] acted willfully in failing to delete the . . . entry"). Thus, the district court did not err in granting summary judgment to the Ocwen Defendants on Plaintiff's claim for statutory damages.

*C. The Ocwen Defendants' Alternative Arguments that no Violation Occurred*

Having concluded Plaintiff's FCRA claim survives summary judgment to the extent it is based on his alleged emotional damages, we must now consider whether summary judgment was otherwise appropriate on this claim. The Ocwen Defendants offer two alternative bases for affirming the district court's grant of summary judgment. We may, of course, "affirm on any grounds supported by the record." *Bixler v. Foster*, 596 F.3d 751, 760 (10th Cir. 2010) (internal quotation marks omitted).

The Ocwen Defendants first argue their reporting of Plaintiff's non-payment of the loan was accurate and cannot give rise to an FCRA violation. To demonstrate the reports were accurate, they point to Plaintiff's acknowledgment they did not receive the refinancing payoff and to his shared belief the payoff funds were stolen by an unidentified party. However, as several of our sister circuits have explained, the FCRA's requirement that furnishers of information correct "incomplete or inaccurate" information, 15 U.S.C. § 1681s-2(b)(1)(D),

extends not only to false information, which "is clearly inaccurate," but to information provided "in such a manner as to create a materially misleading impression" as well, *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 617 (6th Cir. 2012) (internal quotation marks omitted). *See, e.g.*, *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 148 (4th Cir. 2008) ("Congress clearly intended furnishers to review reports not only for inaccuracies in the information reported but also for omissions that render the reported information misleading."). The Ocwen Defendants did not provide any argument on whether their reporting of Plaintiff's non-payment of the loan without any mention of Plaintiff's dispute created a materially misleading impression. On this record, we cannot conclude the Ocwen Defendants are entitled to summary judgment. *See Saunders*, 526 F.3d at 150 (affirming denial of the defendant's motion for judgment as a matter of law because a "jury could reasonably conclude that [the defendant's] decision to report the debt without *any* mention of a dispute was misleading in such a way and to such an extent that it can be expected to have an adverse effect" (internal quotation marks omitted)).

The Ocwen Defendants additionally argue they are entitled to summary judgment because their investigation fully complied with the requirements of § 1681s-2(B)(1). They maintain the district court erred in determining, based on the December 5 letter from CMS, their investigation concluded on that date, and the subsequent two and a half month delay in removing the negative credit

-26-

reporting was "some evidence" the Ocwen Defendants violated the FCRA. (App. at 2392.) The Ocwen Defendants argue CMS's December 5 letter cannot be attributed to them, and therefore, there is no evidence their investigation concluded on that date. As a result, they maintain there is no evidence their investigation concluded or they were "on notice that [their] credit reporting was incorrect," requiring them to take action to have it corrected. (Ocwen Defs.' Answer Br. at 39.)

Although less than clear, the Ocwen Defendants' argument appears to be based on a misinterpretation of the requirement of § 1681s-2(b)(1)(D); specifically, they appear to argue that furnishers of information, such as themselves, have thirty days from the *conclusion of their investigation*, whenever that may be, to inform CRAs of the results and delete or modify the reporting if the information is found to be incomplete or inaccurate. However, § 1681s-2(b)(2) requires furnishers of information to complete their obligations under subsection (b)(1) "before the expiration of the period under section 1681i(a)(1)," which is thirty days from the date the CRA receives notice of the dispute. 15 U.S.C. §§ 1681s-2(b)(2), 1681i(a)(1); *see also Marshall v. Swift River Acad., LLC*, 327 F. App'x 13, 15 (9th Cir. 2009) (stating § 1681s-2(b)(2) "oblig[ates] furnishers to fulfill their Section 1681s-2(b) duties by the CRA's 30-day deadline for completing its reinvestigation"). As discussed above, there is at least a genuine dispute of fact as to whether the Ocwen Defendants' reporting created a

materially misleading impression, rendering it "incomplete or inaccurate" under § 1681s-2(b). As a result, a jury could conclude the Ocwen Defendants' failure to remove or modify the negative reporting until February 15, 2007—nearly four months after TransUnion notified them of the dispute—violated § 1681s-2(b). We are therefore unable to affirm summary judgment on either of the Ocwen Defendants' alternative bases.

## II. Fair Debt Collection Practices Act

The FDCPA prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. Conduct that is a violation of this prohibition includes "threat[ening] to take any action that cannot legally be taken or that is not intended to be taken," and "[c]ommunicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed." *Id.* § 1692e(5), (8). In his second amended complaint, Plaintiff alleged the Ocwen Defendants violated the FDCPA by communicating or threatening to communicate to CRAs false information concerning his credit worthiness "after being informed that the debt had been paid off" and by failing to communicate the debt was in dispute after Plaintiff notified them of this fact. (App. at 71.) Plaintiff also asserted an FDCPA claim against CMS, alleging it violated the act by threatening a foreclosure action that could not legally be taken and by failing to stop the

foreclosure proceedings or rescind the threat "until well after Plaintiff had been irreparably damaged." (*Id.* at 72.)

### A. Claim against the Ocwen Defendants

The FDCPA applies only to "debt collectors." Specifically excluded from the definition of "debt collector" is "any person collecting or attempting to collect any debt . . . which was not in default at the time it was obtained by such person." 15 U.S.C. § 1692a(6)(F). Because the Ocwen Defendants acquired Plaintiff's loan on May 15, 2006, when it was undisputedly current, they are not considered debt collectors under the FDCPA. Plaintiff concedes this fact. He nevertheless argues the Ocwen Defendants should be considered debt collectors for their actions taken after October 20, 2006, when the loan was transferred to NCC (a debt collector), because those actions were undertaken as agents for NCC. In support of his argument the Ocwen Defendants were acting as NCC's agents, Plaintiff relies entirely on NCC's January 29, 2007, letter written on behalf of NCC and the Ocwen Defendants, in which the NCC representative assured Plaintiff that "we have requested a correction to [Plaintiff's] credit." (App. at 1492.) Specifically, Plaintiff argues the "fact that [the NCC representative] wrote on behalf of Ocwen and uses the collective 'we' in his letter confirms the agency relationship between Ocwen and NCC Servicing." (Appellant's Reply Br. to Ocwen Defendants at 25.)

Aside from Plaintiff's conclusory assertion that an agency relationship

existed between NCC and the Ocwen Defendants, he has provided no evidence that creates a genuine dispute of fact as to whether after October 20, 2006, the Ocwen Defendants' actions were undertaken as agents of NCC, thereby rendering them debt collectors under the FDCPA. "Although our summary judgment standard requires us to view the facts in the light most favorable to the non-moving party, it does not require us to make unreasonable inferences in favor of the non-moving party." *Carney*, 534 F.3d at 1276 (internal quotation marks and brackets omitted). We cannot reasonably infer from the fact that NCC wrote a letter on behalf of itself and the Ocwen Defendants in which it used the word "we" that the Ocwen Defendants were agents of NCC. Nor can we reasonably infer from the mere fact that the Ocwen Defendants continued their investigation and continued to respond to requests from CRAs that they did so as agents for and on behalf of NCC rather than as part of their own obligations under the FCRA. Without any evidence of an agency relationship between the Ocwen Defendants and NCC, there is no basis from which to conclude the Ocwen Defendants qualify as debt collectors under the FDCPA. Accordingly, the Ocwen Defendants are entitled to summary judgment on this claim.

*B. Claim against CMS*

Pursuant to 15 U.S.C. § 1692k(d), a claim for relief under the FDCPA must be brought "within one year from the date on which the violation occurs." CMS maintains summary judgment was appropriate because Plaintiff's FDCPA claim

against it is barred by the one-year statute of limitations. In his second amended complaint, Plaintiff alleged CMS violated the FDCPA by "threaten[ing] a foreclosure action against Plaintiff's property" and by failing to "stop foreclosure proceedings and/or rescind the threat until well after Plaintiff had been irreparably harmed." (App. at 72.) CMS argues Plaintiff cannot identify any such alleged violation that occurred after January 29, 2007—one year before Plaintiff filed his complaint. CMS sent Plaintiff the debt validation letter on September 7, 2006, placed its file on hold on October 18, 2006, and closed its foreclosure file on December 7, 2006—all well before January 29, 2007.

In an attempt to identify some action by CMS that took place after January 29, 2007, Plaintiff makes three arguments: (1) the threat of foreclosure continued until February 15, 2007, when the Ocwen Defendants reversed the negative credit reports; (2) CMS aided and abetted the Ocwen Defendants' reporting to CRAs that foreclosure proceedings had been initiated and commenced; and (3) CMS failed to reverse the negative credit reports despite acknowledging they were in error. We evaluate each of these arguments individually to determine whether any portion of Plaintiff's claim is not barred by the statute of limitations. *See Solomon v. HSBC Mortg. Corp.*, 395 F. App'x 494, 497 (10th Cir. 2010) ("For statute-of-limitations purposes, discrete violations of the FDCPA should be analyzed on an individual basis.").

With respect to Plaintiff's first argument, he has failed to provide any

-31-

evidence that a threat of foreclosure created by CMS's debt validation letter continued until February 15, 2007. To the contrary, the undisputed evidence shows CMS informed Plaintiff on October 18 that his file would be placed on hold and further informed him on December 5, 2006, of the impending closure of his file. Plaintiff has not pointed to any evidence that would lead him to believe these representations were inaccurate. He has similarly provided no evidence to support his allegation CMS aided and abetted the Ocwen Defendants' reporting to CRAs that foreclosure proceedings had been initiated. Nor does he provide any explanation of how any such action was undertaken "in connection with the collection of any debt." 15 U.S.C. § 1692e.

Turning then to Plaintiff's final argument, we must determine whether CMS's failure to reverse the Ocwen Defendants' negative credit reports despite its acknowledgment the reports were in error constitutes a violation of the FDCPA.[4] This alleged violation is premised on Plaintiff's apparent assertion that § 1692e(8) imposed an affirmative duty on CMS to disclose to the CRAs he had disputed the debt and to take steps to have the Ocwen Defendants' reporting reversed. The Eighth Circuit rejected a similar interpretation of § 1692e(8) in *Wilhelm v. Credico, Inc.*, 519 F.3d 416 (8th Cir. 2008). Reading the general

---

[4] To the extent Plaintiff's argument is based on CMS's representation that it would ensure the Ocwen Defendants' negative credit reports were reversed, such a representation does not impose upon it any statutory obligation under the FDCPA that did not otherwise exist.

provision of § 1692e and Subsection 8 together, the court explained:

> the relevance of the portion of § 1692e(8) on which [plaintiff] relies—
> "including the failure to communicate that a disputed debt is
> disputed"—is rooted in the basic fraud law principle that, if a debt
> collector *elects* to communicate "credit information" about a consumer,
> it must not omit a piece of information that is always material, namely,
> that the consumer has disputed a particular debt.

*Id.* at 418 (emphasis in original). As the Eighth Circuit noted, this interpretation

is consistent with the relevant part of the Federal Trade Commission's Staff

Commentary on the Fair Debt Collection Practices Act, which provides, "If a debt

collector knows that a debt is disputed by the consumer . . . *and reports it to a*

*credit bureau*, he must report it as diputed [sic]." Statements of General Policy or

Interpretation Staff Commentary on the Fair Debt Collection Practices Act, 53

Fed. Reg. 50097-02, 50106 (Dec. 13, 1988) (emphasis added).

We agree with the Eighth Circuit's interpretation of § 1692e(8) that a debt

collector does not have an affirmative duty to notify CRAs that a consumer

disputes the debt *unless* the debt collector knows of the dispute and elects to

report to a CRA. Because it is undisputed CMS never reported to a CRA, it was

under no obligation to inform the CRAs the debt was disputed. Nor was CMS

required to take steps to have the Ocwen Defendants' reporting reversed.[5]

---

[5] Although Plaintiff argues CMS's failure to do so constitutes a violation of
the FDCPA, it appears his argument is in actuality based on a provision of the
FCRA, 15 U.S.C. § 1681s-2, and not the FDCPA. As discussed in connection
with Plaintiff's FCRA claim against the Ocwen Defendants, § 1681s-2 requires a

(continued...)

-33-

Notably, the Federal Trade Commission comments indicate § 1692e(8) does not impose such an obligation even on a debt collector who had reported to a CRA and subsequently learned the debt was disputed: "When a debt collector learns of a dispute after reporting the debt to a credit bureau, the dispute need not also be reported." *Id.* at 50106. Accordingly, CMS's failure to report that Plaintiff disputed the debt or to have the Ocwen Defendants' reporting reversed cannot be considered when evaluating the timeliness of Plaintiff's claim.

Plaintiff has failed to identify actions taken by CMS after January 29, 2007, within the one-year statute of limitations period, that could support a claim under the FDCPA. CMS is therefore entitled to summary judgment on this claim. We need not reach CMS's alternative argument that summary judgment is appropriate because it engaged in only non-judicial foreclosure actions, which it maintains are not covered by the FDCPA. *See Maynard v. Cannon*, 401 F. App'x 389, 395 (10th Cir. 2010) (assuming for purposes of that case that "non-judicial foreclosures are covered by the FDCPA"). "We [again] need not resolve this

---

[5](...continued) person who "furnishes information to one or more consumer reporting agencies" and determines the information it has furnished is not complete or accurate to "promptly notify the consumer reporting agency of that determination and provide to the agency any corrections to that information, or any additional information, that is necessary to make the information provided by the person to the agency complete and accurate." However, Plaintiff has not stated a claim under the FCRA against CMS. We therefore need not consider whether any such claim would survive summary judgment.

debate here." *Id.*

## CONCLUSION

For the foregoing reasons, we **REVERSE** the portion of the district court's order granting summary judgment to the Ocwen Defendants on Plaintiff's FCRA claim based on his alleged emotional damages and **REMAND** for further proceedings. The district court's order is otherwise **AFFIRMED**. Defendant CMS's motion for attorney fees is **DENIED.**