**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

JAMES MORDEN; JENALYN
MORDEN; WADE MORDEN,

     Plaintiffs - Appellants/Cross-
Appellees,

v.

XL SPECIALTY INSURANCE,

     Defendant - Appellee/Cross-
Appellant.

_____

No. 17-4029

JAMES MORDEN; JENALYN
MORDEN; WADE MORDEN,

     Plaintiffs - Appellees,

v.

XL SPECIALTY INSURANCE,

     Defendant - Appellant.

No. 17-4038

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:15-CV-00862-RJS)**
_____

Erik A. Olson, Marshall Olson & Hull, P.C., Salt Lake City, Utah, for Plaintiffs-
Appellants/Cross-Appellees.

David M. Gische, Clyde & Co US LLP, Washington, D.C. (Jennifer Mathis, Troutman Sanders LLP, San Francisco, CA on the briefs) for Defendant-Appellee/Cross-Appellant.

———————————————————

Before **BRISCOE**, **HARTZ**, and **PHILLIPS**, Circuit Judges.

———————————————————

**HARTZ**, Circuit Judge.

———————————————————

This appeal concerns an assigned claim on a liability-insurance policy. Belsen Getty, LLC, a registered investment adviser owned by Terry Deru, obtained a claims-made financial-services-liability policy (the Policy) from XL Specialty Insurance Company covering Belsen Getty and its advisers for the period from October 9, 2010, to October 9, 2011. Under the policy, XL had no duty to defend. During the policy period James, Jenalyn, and Wade Morden brought claims against Belsen Getty and Deru alleging improper and misleading investment advice, but XL denied coverage. XL asserted that the Mordens' claims and claims brought by the Securities and Exchange Commission (SEC) before the policy period concerned "Interrelated Wrongful Acts," as defined by the Policy, and that the Policy therefore required treating the two claims as one claim made before the policy period.

Belsen Getty and Deru then settled with the Mordens, assigning their rights against XL; and the Mordens sued XL in the United States District Court for the District of Utah, raising the assigned claims that XL breached its covenant of good faith and fair dealing and its fiduciary duties to Belsen Getty and Deru in denying coverage under the Policy. XL counterclaimed that the Policy's Interrelated Wrongful Acts provision precluded coverage. The Mordens moved for partial summary judgment on the

2

counterclaim and on several of XL's affirmative defenses, and XL moved for summary judgment under the Interrelated Wrongful Acts provision and for failure to prove bad faith or breach of fiduciary duty. Pertinent to this appeal, the district court denied XL's counterclaim but granted it summary judgment anyway for lack of evidence supporting the bad-faith and fiduciary-duty claims. The court also denied the Mordens' motion to amend their complaint to add a breach-of-contract claim.

The Mordens appeal the summary judgment against them on their bad-faith and fiduciary-duty claims and the denial of their motion to amend their complaint to add a breach-of-contract claim. XL cross-appeals the summary judgment against it on its counterclaim that the Policy's Interrelated Wrongful Acts provision bars all the Mordens' claims. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse the denial of XL's motion for summary judgment on its counterclaim. This reversal undermines the Mordens' challenges to the summary judgment against them and the denial of their motion to amend. We therefore affirm the summary judgment against the Mordens on their claims and the denial of their motion to amend.

## I.    BACKGROUND

We first describe the misconduct of Deru and Belsen Getty alleged by the SEC and the Mordens and then summarize the SEC proceedings and the Mordens' lawsuit against the two before turning to the relevant provisions of the Policy and the Mordens' claims against XL.

3

## A. Alleged Misconduct by Belsen Getty

Belsen Getty, through Deru and other advisers, counseled clients regarding their investments. Sometimes it recommended the clients buy certain investments. Sometimes, exercising discretionary trading authority granted by clients, it made investments before getting client approval, although clients later received statements showing the investments and could inquire about the propriety of the investments at that time. The misconduct alleged against Belsen Getty and Deru involved client investments in four ventures from 2005 to 2009. The investments and the ventures were quite varied in nature. But the allegations against Belsen Getty and Deru with respect to the investments share common threads. Clients were promised too much, not warned of risks, and not informed of conflicts of interest of their advisers, who had undisclosed stakes in the ventures. The ventures were Nine Mile Software, Inc. (Nine Mile); Axxess Funding Group, LLC (Axxess); ProFire Energy, Inc. (ProFire); and Vermillion Holdings, LTD (Vermillion). We discuss in turn the allegations regarding each venture.

### 1. Nine Mile

In 2006, Deru, his son Damon (who was a Belsen Getty adviser), and Andrew Limpert (another Belsen Getty adviser) founded Nine Mile, a software company. Damon was its CEO and Limpert was the chairman of its board of directors. In 2007 the company issued 1,882,000 shares of restricted stock, three quarters of which was owned by the three men. Later that year Nine Mile commenced an initial public offering of its common stock, issuing 714,288 shares at $ 0.70 a share. Nine Mile was illiquid at the time. Yet more than 90% of the stock was sold to Belsen Getty clients, as Deru and

4

Limpert recommended the stock or purchased it using their discretionary trading authority over investor accounts. Deru ignored the preferences of risk-averse clients and invested their money without disclosing the risk, and he promised quick profits. He did not disclose to investors that Belsen Getty's discretionary trading authority over client accounts gave it control over the great majority of the shares after the offering.

After the initial offering Deru manipulated the market in Nine Mile stock by using his discretionary trading authority over client accounts to repeatedly buy and sell Nine Mile stock (still without informing clients of the risks or of his conflict of interest). This inflated the stock price by creating phony trading volume and making it appear that there was considerable investor interest.

### 2. Axxess

In 2005, Deru, Limpert, and Damon formed Axxess, a firm that loaned money secured by real estate. They raised money for the firm from Belsen Getty clients in private offerings in 2005 and 2007–08, exercising their discretionary authority over client accounts and recommending the investment to clients. The private placement memoranda for the offerings said that Deru, Limpert, and Damon would manage the company and vote on decisions, and noted that all of them had extensive education and experience qualifying them for these posts. They also represented that compensation for the three would come from only a management fee and a share of profits. Contrary to these representations, however, Deru managed the company himself without input from the other two men, and he used his position to his family's financial advantage. He paid his high-school-educated son $300,000 in 2007–08 (about 10% of what was raised in the

5

private offerings) to do very little work (which should have been performed by the three founders anyway); and he loaned himself $500,000 of company funds without informing the members of the LLC or obtaining the required unanimous consent.

### 3. ProFire

In 2008 Deru and Limpert bought restricted stock in a public shell company through a private sale. After a merger they renamed the company ProFire, and Limpert became the firm's chief financial officer. Belsen Getty controlled most of the unrestricted stock in the company. In 2009, Deru sold restricted ProFire stock, including some of his personal shares, to Belsen Getty clients, either touting the investment as providing a quick return or using his discretionary authority over client accounts to make the purchase for the client without prior consent. He did not disclose that unrestricted ProFire stock was available in the open market, that the stock he sold was not freely tradable, or that he had a significant interest in the company.

### 4. Vermillion

In March 2009 Deru advised the Mordens to be prudent with their investments. The next month he began pitching to them an investment in the Vermillion gold-mine project in Mexico. He persuaded them to eventually lend Vermillion $1 million by emphasizing that the loan was not risky and would be quickly repaid because the mine operation "was ready to go." Aplt. App., Vol. 1 at A114. He claimed Vermillion had the rights to an operational gold-processing plant that would be able to generate a positive cash flow after the first year, that the operation was run by experienced personnel, that all the necessary permits had been obtained, and that extensive testing on samples indicated

6

that the mine had profitable amounts of gold in it.  But after investing, the Mordens

learned that Deru had significantly misrepresented the project's readiness.  The required

permits had not been obtained; Vermillion did not own the mining concessions; and the

mining plant and necessary equipment still needed to be moved to the site.  Although

Deru told the Mordens that he had invested in the mine, he failed to disclose that

Vermillion had no rights to the mine, which was actually owned by a Mexican company

that was 99% owned by Deru, or that the plant purchased by Vermillion was transferred

to Deru's company.

### B.    The SEC Investigation

In February 2009, before the policy period, the SEC sent letters to Nine Mile,

Belsen Getty, Deru, Damon, and Limpert saying that the SEC staff "intends to

recommend that the [SEC] bring . . . civil injunctive action[s] against [each of them],

alleging that [they] violated" various securities laws.  Aplt. App., Vol. 2 at A377–A86.

Although the investigation may initially have been limited to conduct relating to Nine

Mile, the investigation broadened.  The SEC issued a formal order of investigation on

September 24, 2009 (which was given to Deru no later than August 17, 2010) stating that

from at least May 2007, Belsen Getty and its officers, directors, and employees may have

made "false statements of material fact or fail[ed] to disclose material facts concerning,

among other things, the suitability of recommended investments, conflicts of interest,

control of the common stock of Nine Mile, and the value of client portfolios."  Aplt.

App., Vol. 3 at A567.  The formal order commenced investigative proceedings through

which the SEC was empowered to compel testimony and production of relevant records.

*See* 15 U.S.C § 78u(b); *SEC v. Blackfoot Bituminous, Inc.*, 622 F.2d 512, 514 (10th Cir. 1980). In April 2010 the SEC deposed James Morden about his investments in Vermillion and Axxess, as well as Nine Mile. The agency deposed Limpert later that month, and Damon in June. In August it deposed Deru about his involvement in all four ventures.

In May 2011, after the policy period began, the SEC issued an order instituting administrative cease-and-desist proceedings that alleged claims against Belsen Getty, Deru, and Limpert relating to the four ventures. For Nine Mile, the advisers were accused of failing to disclose to their clients the riskiness of the public offering and their significant interests in the company; and Deru was also accused of manipulating the market in Nine Mile stock by exercising his discretionary authority over client accounts. For Axxess, the advisers were accused of misrepresenting how the company was managed and failing to disclose highly excessive payments to Deru's son and a $500,000 loan to Deru. For ProFire, Deru was accused of exercising his discretionary authority to purchase for a client $50,000 of his personal restricted stock without obtaining prior permission or disclosing his interest in writing. He then exaggerated the potential rate of return, while failing to disclose that nonrestricted stock could be acquired, probably at a lower price. And for Vermillion, Deru was accused of misleading the Mordens about the safety of the investment in the gold-mine operation—failing to disclose that Vermillion had no rights to the mine and was in financial distress—and failing to disclose his financial interest.

8

In July 2012 the SEC entered a cease-and-desist order and imposed remedial sanctions on Belsen Getty and Deru arising out of their conduct with respect to Nine Mile, Axxess, and ProFire.

### C. The Morden Action

In October 2011, a little more than four months after the SEC issued its order initiating administrative proceedings, the Mordens sued Belsen Getty and Deru in state court. Although the Mordens' complaint raised a number of federal-law and state-law claims, the alleged factual basis of the claims (which were restricted to the Mordens' investments in each of the ventures) tracked the allegations in the SEC order in describing the misconduct with respect to the investments in Nine Mile, Axxess, ProFire, and Vermillion.[1] Most notable is that two paragraphs in the complaint summarizing the misconduct are virtually identical to language in the SEC order:

> 88. Belsen Getty, through Deru, recommended high-risk, speculative, and illiquid investments to J. Morden and J.C. Morden, even though the investments did not match their investment objectives. These investments include Nine Mile, Axxess, ProFire *and Vermillion*.
>
> 89. Belsen Getty, through Deru, purchased investments for J. Morden and J.C. Morden using Belsen Getty's discretionary

---

[1] *E.g.*, *compare* Aplt. App., Vol. 1 at A110 ¶ 18 (Complaint: "Deru did not disclose to the Mordens that Belsen Getty controlled the outstanding non-restricted stock of Nine Mile."), *with* Aplt. App., Vol. 4 at A966 ¶ 2 (SEC order: "Belsen Getty, through Deru and Limpert, failed to disclose that Belsen Getty exercised discretionary trading authority over, and thus controlled, 92% of the outstanding non-restricted Nine Mile Stock."); *compare* Aplt. App., Vol. 1 at A111 ¶ 22 (Complaint: "Deru hired his high-school educated son to perform functions that were supposed to be performed by Deru and other management."), *with* Aplt. App., Vol. 4. at A967 ¶ 10 (SEC order: "Deru hired his high-school educated son to perform many of the functions that were supposed to be performed by the members and for which the members received compensation . . . .").

authority and did not disclose material information about such investments, including conflicts of interest, and financial interests in such investments by Deru. These investments included Nine Mile, Axxess, ProFire *and Vermillion.*

Aplt. App., Vol. 1 at A122 (emphasis added). The complaint did depart from the SEC order, however, in linking the other three ventures to Vermillion, which was not mentioned in the paragraph in the order.[2]

### D.     The Policy

After being sued by the Mordens, Belsen Getty demanded that XL cover the claim. XL denied coverage. It argued that the Wrongful Acts alleged in the complaint and the misconduct alleged by the SEC were Interrelated Wrongful Acts, which are deemed to be a single claim made at the time of the earlier claim. According to XL, because the SEC claim predated the policy period, the complaint is deemed to also predate the period and therefore is not covered. The pertinent provisions of the Policy are as follows:

---

[2]  The SEC order stated:

> Belsen Getty, through Deru, recommended high-risk, speculative, and illiquid investments to Belsen Getty clients, even though the investments did not match the clients' investment objectives. Belsen Getty, through Deru, completed many purchases for clients using Belsen Getty's discretionary authority and did not disclose material conflicts of interest, namely that Deru, Limpert, and/or Deru's family members had a financial interest in these investments. These high risk investments included Nine Mile, Access, and ProFire.

Aplt. App., Vol. 4 at A968.

The Policy was a "claims-made" policy that "only applie[d] to claims first made during the policy period," which ran from October 9, 2010 to October 9, 2011. *Id.* at A50. The Policy defines a *claim* as:

(1) any written notice received by an Insured that any person or entity intends to hold any Insured responsible for a Wrongful Act;
(2) any civil proceeding in a court of law or equity, or arbitration; or
(3) any criminal proceeding which is commenced by the return of an indictment.

*Id.* at A62 (emphasis omitted).

*Wrongful Act* is defined as actual or alleged defamation or:

any actual or alleged act, error, omission, misstatement, misleading statement or breach of fiduciary duty or other duty committed by any Insured in the performance of, or failure to perform, Professional Services.

*Id.* at A68 (emphasis omitted). If a claim was first made against Belsen Getty within the policy period, XL insured against the claim even if the underlying Wrongful Acts took place outside the policy period.

When an insured has multiple claims against it, as Belsen Getty had here, the Policy's "Interrelated Wrongful Acts" provision comes into play. In that circumstance:

All claims arising from **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim** and *shall be deemed to have been made at the earliest time at which the earliest such **Claim** is made* or deemed to have been made pursuant to [notice provisions of the Policy].

*Id.* at A65 (emphasis added). *Interrelated Wrongful Acts* are broadly defined as:

**Wrongful Acts** which are based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the same or related or series of related facts, circumstances, situations, transactions or events.

*Id.* at A62.

11

### E. Mordens' Settlement with Belsen Getty and Suit Against XL

In 2014 Belsen Getty and its advisers settled with the Mordens. Although the Mordens' complaint raised claims about their investments in all four ventures, the settlement mentioned only the misconduct concerning the Vermillion deal. As part of the settlement, the Mordens were assigned Belsen Getty's and Deru's rights under the Policy, though Belsen Getty and Deru would receive a small percentage of any recovery the Mordens obtained from XL. The Mordens then sued XL but summary judgment was entered against them. That summary judgment and the district court's denial of XL's counterclaim based on the Interrelated Wrongful Acts provision are the subjects of this appeal.

## II. DISCUSSION

"We review a district court's decision to grant summary judgment de novo, applying the same standard as the district court [should apply]." *Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1178 (10th Cir. 2013) (internal quotation marks omitted). "Summary judgment is appropriate if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

The Mordens argue on appeal that the district court improperly granted summary judgment on their bad-faith and fiduciary-duty claims, and also erred by denying their motion to amend to add a breach-of-contract claim. XL cross-appeals the denial of its interrelated-wrongful-acts counterclaim. Because we conclude that the Interrelated

Wrongful Acts provision applies here and bars coverage, we can summarily dispose of the other issues on appeal.

### A.     The Interrelated Wrongful Acts Provision

The Mordens do not dispute that the initial SEC notices to Nine Mile, Belsen Getty, Deru, Limpert, and Damon constituted a claim within the meaning of the Policy. Nor do they dispute that those notices encompassed at least the alleged misconduct relating to Nine Mile. Their argument is that the Wrongful Acts underlying their claims about Vermillion, which purportedly are the only ones that form the basis of their settlement with Belsen Getty, are too distinct from the misconduct relating to the other ventures to constitute Interrelated Wrongful Acts. We disagree. The Vermillion-based Wrongful Acts in the Mordens' claims and the Nine Mile-based Wrongful Acts in the initial SEC notices are interrelated. We therefore need not address whether the Mordens construe the notion of a claim too narrowly. In particular, we need not decide (1) whether a settlement can successfully circumvent policy provisions precluding coverage by declaring that the settlement is not based on claims in the operative complaint for which there was not coverage or (2) whether the SEC's formal order of investigation constituted a claim, or at least expanded the SEC's original claim.

The Policy's test for whether Wrongful Acts are interrelated is quite broad: the acts must merely be "based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the same or related or series of related facts, circumstances, situations, transactions or events." Aplt. App., Vol. 1 at A62. That test is satisfied here because the Wrongful Acts relating to Vermillion were committed by

13

the same entity (Belsen Getty), against the same victims (the Mordens and other clients), using the same techniques (understating risk, overstating upside potential, and concealing financial interests of the advisers), during the same time frame (2005–2009). To quote again two allegations from the Mordens' complaint:

> 88. Belsen Getty, through Deru, recommended high-risk, speculative, and illiquid investments to J. Morden and J.C. Morden, even though the investments did not match their investment objectives. *These investments include Nine Mile, Axxess, ProFire and Vermillion.*
>
> 89. Belsen Getty, through Deru, purchased investments for J. Morden and J.C. Morden using Belsen Getty's discretionary authority and did not disclose material information about such investments, including conflicts of interest, and financial interests in such investments by Deru. *These investments included Nine Mile, Axxess, ProFire and Vermillion.*

*Id.* at A122 (emphasis added).

In reaching this conclusion we are guided by precedent of this court construing similar language. In *Brecek & Young Advisors, Inc. v. Lloyds of London Syndicate 2003*, 715 F.3d 1231, 1238 (10th Cir. 2013), we relied on the portion of the policy defining interrelated wrongful acts to include wrongful acts that are "connected by reason of *any* common fact, circumstance, situation, transaction, casualty, event, decision or policy or one or more series of facts, circumstances, situations, transactions, casualties, events, decisions or policies." We held that the wrongful acts alleged in three separate arbitration proceedings were interrelated because of several common facts: the same alleged culprits, roughly the same time period ("from the late 1990s to the mid 2000s"), and similar alleged fraud—selling "unsuitable investment products including various types of annuities" and churning or flipping investment accounts. *Id.* at 1238. The minor

14

variations in the arbitration claims were inconsequential.  *See id*. at 1238–39; *see also*

*Kilcher v. Cont'l Cas. Co.*, 747 F.3d 983, 990 (8th Cir. 2014) (when construing broad

"Interrelated Wrongful Acts" provision, court states that variations in the specifics of the

fraud perpetuated against various clients were immaterial "micro-distinguishing" factors,

particularly in light of the victims' allegations of similarity).

The policy provision in this case is, if anything, broader than the one in *Brecek*.

The language is comprehensive, treating Wrongful Acts as interrelated if they are "in any

way involving any of the same or related or series of related facts, circumstances,

situations, transactions or events."  Aplt. App., Vol. 1 at A62.  The policy in *Brecek*

required "common" facts, etc., 715 F.3d at 1238, which strikes us as more restrictive

language than merely "related" facts, etc.  In our view, the Mordens' complaint alleges a

practice—a scheme—of defrauding investors over a period of several years by means of

"related" misconduct.  Belsen Getty, particularly Deru, obtained investors in ventures in

which the defrauders had undisclosed financial stakes by misrepresenting the risks and

rewards of the ventures.

The Mordens attempt to distinguish *Brecek* by pointing out that our decision in

that case was applying New York law, whereas it is undisputed that Utah law governs

this case.  True, the source of the governing law is a different jurisdiction.  But *Brecek*

did not turn on any idiosyncrasy of New York law.  Our reliance on decisions applying

New York law was limited to the requirements that policy language be unambiguous, that

the insurer bear the burden to establish that a claim falls within a policy exclusion, and

that "[t]o negate coverage, exclusions must be stated in clear and unmistakable language,

15

subject to no other reasonable interpretation, and applicable in the particular case." *Id.* at 1237–38. The Mordens have not directed us to any Utah law to the contrary or, more importantly, any Utah law that would call into question the application here of our analysis in *Brecek*. What we did in that case, like what we are doing here, is no more than providing the natural construction of policy language—that is, what it would mean "to a person of ordinary intelligence and understanding, in accordance with the usual and natural meaning of the words, and in the light of existing circumstances, including the purpose of the policy." *Lopez v. United Auto. Ins. Co.*, 274 P.3d 897, 902 (Utah 2012) (ellipsis and internal quotation marks omitted).

### B.      Remaining Claims

Because the Mordens' claims against Belsen Getty and Deru are not covered by the Policy, there is no basis for any bad-faith or breach-of-fiduciary-duty claim against XL. *See S.W. Energy Corp. v. Cont'l Ins. Co.*, 974 P.2d 1239, 1243 (Utah 1999) ("[G]iven that the insurer's denial of coverage was proper, [the insured's] claims for bad faith . . . [and] breach of fiduciary duty . . . were appropriately dismissed."). And the Mordens' challenge to the district court's refusal to permit them to raise a claim of breach of contract is obviously foreclosed as well.

### III.    CONCLUSION

We **REVERSE** the district court's order dismissing XL's counterclaim and **REMAND** with instructions to grant summary judgment on the counterclaim, and we **AFFIRM** the entry of summary judgment against the Mordens.

16