**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 29, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

LEO LECH; ALFONSIA LECH; JOHN
LECH,

     Plaintiffs - Appellants,

v.

CHIEF JOHN A. JACKSON;
COMMANDER DUSTIN VARNEY;
OFFICER MIC SMITH; OFFICER JEFF
MULQUEEN; OFFICER AUSTIN
SPEER; OFFICER JARED ARTHUR;
OFFICER BRYAN STUEBINGER;
OFFICER JUAN VILLALVA; OFFICER
ANDY WYNDER; OFFICER ANTHONY
COSTARELLA; OFFICER ROB
HASCHE, of the Greenwood Village
Police Department, individually and in
their official capacities; THE CITY OF
GREENWOOD VILLAGE,

    Defendants - Appellees.

------------------------------

COLORADO MUNICIPAL LEAGUE;
INTERNATIONAL MUNICIPAL
LAWYERS ASSOCIATION,

    Amici Curiae.

No. 18-1051
(D.C. No. 1:16-CV-01956-PAB-MJW)
(D. Colo.)

_____

## ORDER AND JUDGMENT[*]

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. But it may be cited for its persuasive value. _See_ Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

_____

Before **HOLMES**, **McKAY**, and **MORITZ**, Circuit Judges.
_____

Leo, Alfonsia, and John Lech (the Lechs) sued the City of Greenwood Village (the City) and several of its police officers (the officers),[1] alleging violations of the Takings Clause of the Fifth Amendment of the United States Constitution and Article II, Section 15 of the Colorado Constitution. In support of their Takings Clause claims, the Lechs alleged the defendants violated their constitutional rights—first by damaging the Lechs' Colorado home during an attempt to apprehend a criminal suspect and later by refusing to compensate the Lechs for this alleged taking. The district court granted the defendants' motion for summary judgment, concluding in relevant part that (1) when a state acts pursuant to its police power, rather than the power of eminent domain, its actions do not constitute a taking; (2) because the officers destroyed the Lechs' home while attempting to enforce the state's criminal laws, they acted pursuant to the state's police power; and (3) any damage to the Lechs' home therefore fell outside the ambit of the Takings Clause.

The Lechs appeal, arguing the district court erred in granting the defendants' motion for summary judgment. In support, they first assert the district court erred in "draw[ing] a hard line between" the power of eminent domain and the state's police power. Aplt. Br. 16. Alternatively, they argue that even if such a "line" exists, the

_____

[1] Where appropriate, we refer to the City and the officers collectively as the defendants.

2

district court erred in ruling that the defendants acted pursuant to the state's police power here. *Id.* For the reasons discussed below, we reject these arguments and affirm the district court's order.[2]

## Background

We take the bulk of the following facts from the district court's order granting summary judgment to the defendants. In doing so, we view the evidence in the light most favorable to, and draw all reasonable inferences in favor of, the Lechs.[3] *See Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 882 (10th Cir. 2018).

Leo and Alfonsia Lech purchased the home at 4219 South Alton Street in Greenwood Village, Colorado, for their son, John Lech. At the time of the relevant events, John Lech lived at the home with his girlfriend and her nine-year-old son. On June 3, 2015, officers from the City's police department responded to a burglar alarm at the Lechs' home and learned that Robert Seacat, an armed criminal suspect who was attempting to evade capture by the Aurora Police Department, was inside.

---

[2] Because we may affirm the district court's order based solely on its conclusion that the defendants' law-enforcement efforts fell within the scope of the police power (and therefore fell outside the scope of the Takings Clause), we need not and do not address whether the Lechs' Takings Clause claims *also* fail under what the district court referred to as the "emergency exception" to the Takings Clause. App. vol. 2, 398.

[3] The defendants filed a supplemental appendix that contains, among other things, documents from the fleeing suspect's related criminal proceedings. Because we see no indication that the defendants submitted these documents to the district court, we decline to consider them. *See John Hancock Mut. Life Ins. Co. v. Weisman*, 27 F.3d 500, 506 (10th Cir. 1994) ("This court has held that it cannot, in reviewing a ruling on summary judgment, consider evidence not before the district court.").

Although the nine-year-old son of John Lech's girlfriend was present at the time of the break-in, he was able to exit the home safely.

To prevent Seacat from escaping, the officers positioned their vehicles in the driveway of the Lechs' home. Seacat then fired a bullet from inside the garage and struck an officer's car. At that point, the officers deemed the incident a high-risk, barricade situation.[4] For approximately five hours, negotiators attempted to convince Seacat to surrender. After these efforts to negotiate proved unsuccessful, officers employed increasingly aggressive tactics: they fired several rounds of gas munition into the home, breached the home's doors with a BearCat armored vehicle so they could send in a robot to deliver a "throw phone" to Seacat, and used explosives to create sight lines and points of entry to the home. App. vol. 2, 380. The officers also sent in a tactical team to apprehend Seacat. But Seacat fired at the officers while they were inside, requiring them to leave. When even these more aggressive tactics failed to draw Seacat out, officers used the BearCat to open multiple holes in the home and again deployed a tactical team to apprehend Seacat.

This time, the tactical team was successful: it managed to disarm Seacat and take him into custody. But as a result of this 19-hour standoff, the Lechs' home was rendered uninhabitable. And although the City offered to help with temporary living

---

[4] According to the police department's manual, a high-risk situation is one that involves "[t]he arrest or apprehension of an armed or potentially armed subject where the likelihood of armed resistance is high." Supp. App. vol. 1, 27. A barricade situation involves a "standoff created by an armed or potentially armed suspect . . . who is refusing to comply with police demands for surrender." *Id.*

expenses when the Lechs demolished and rebuilt their home, it otherwise denied liability for the incident and declined to provide any further compensation.

The Lechs then sued the defendants, alleging, in relevant part, that the defendants violated the Takings Clause of both the United States and Colorado Constitutions by damaging the Lechs' home without providing just compensation. The district court rejected this argument. In doing so, it first distinguished between the state's "eminent[-]domain authority, which permits the taking of private property for public use," and the state's "police power, which allows [it] to regulate private property for the protection of public health, safety, and welfare." *Id.* at 390. The district court then ruled that although a state may "trigger[] the requirement of just compensation" by exercising the former, a state's exercise of the latter does not constitute a taking and is therefore "noncompensable." *Id.* at 390–91.

Next, the district court determined that the state's police power encompasses "the enforcement of" a state's "criminal laws." *Id.* at 397. And because the officers damaged the Lechs' home while attempting to apprehend a criminal suspect, the district court reasoned, their actions fell within the scope of "the state's police powers and not the power of eminent domain." *Id.* at 399. Thus, the district court concluded, any damage the officers caused to the Lechs' home did not constitute a taking for purposes of the Takings Clause. Accordingly, it granted the defendants' motion for summary judgment on the Lechs' Takings Clause claims.[5] The Lechs now

---

[5] The Lechs also alleged various other claims. But they do not challenge the district court's resolution of those claims on appeal. Accordingly, we discuss the

appeal the district court's order.

## Analysis

The parties agree that the Takings Clause of the Fifth Amendment "requires compensation when a taking occurs." *Alto Eldorado P'ship v. Cty. of Santa Fe*, 634 F.3d 1170, 1174 (10th Cir. 2011); *see also* U.S. Const. amend. V (providing that private property shall not "be taken for public use, without just compensation").[6] But they disagree about whether a taking occurred here. According to the Lechs, the defendants' conduct amounts to a taking because (1) the officers physically intruded upon and ultimately destroyed their home and (2) such a "physical appropriation of property gives rise to a *per se* taking." Aplt. Br. 9. The defendants, on the other hand, argue that no taking occurred because the officers damaged the Lechs' home pursuant to the police power, not the power of eminent domain. The district court agreed with the defendants: it concluded that "the tactical decisions that ultimately destroyed [the Lechs'] home were made pursuant to the state's police powers and not the power of

---

Lechs' remaining claims only to the extent they are relevant to our Takings Clause analysis.

[6] The Colorado Constitution contains similar, albeit not identical, language. *See* Colo. Const. art. II, § 15 ("Private property shall not be taken *or damaged*, for public or private use, without just compensation." (emphasis added)). Notably, the Lechs acknowledged in district court that their rights under the state and federal Takings Clauses are "essentially the same." App. vol. 2, 307. The district court agreed, ruling that because the Colorado Supreme Court has interpreted the state Takings Clause consistently with the federal Takings Clause, the Lechs' Takings Clause claims could "be considered together." *Id.* at 389 n.9; *cf. Animas Valley Sand & Gravel, Inc. v. Bd. of Cty. Comm'rs*, 38 P.3d 59, 63–64 (Colo. 2001). Because the Lechs do not challenge this aspect of the district court's ruling on appeal, we likewise analyze their state and federal Takings Clause claims collectively.

eminent domain." App. vol. 2, 399. Thus, the district court ruled, the defendants' conduct did not constitute a taking for purposes of the Taking Clause.

In challenging the district court's ruling on appeal, the Lechs advance two general arguments. First, they assert the district court erred in ruling that when the government acts pursuant to its police power, its actions cannot constitute a taking for purposes of the Takings Clause. Second, they argue that even assuming the distinction between the state's police power and its power of eminent domain is dispositive of the taking question, the district court erred in concluding that the officers' conduct here fell within the scope of the state's police power merely because the officers damaged the Lechs' home while "enforcing the law." Aplt. Br. 23. In evaluating these arguments, we review de novo the district court's decision to grant summary judgment to the defendants, applying the same standard as the district court. *Morden v. XL Specialty Ins.*, 903 F.3d 1145, 1151 (10th Cir. 2018). "Summary judgment is appropriate if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1178 (10th Cir. 2013) (quoting Fed. R. Civ. P. 56(a)).

## I.      Takings, the Police Power, and the Power of Eminent Domain

On appeal, the Lechs first argue the district court erred in drawing a "hard line" between those actions the government performs pursuant to its power of eminent domain and those it performs pursuant to its police power. Aplt. Br. 16. The Lechs do not dispute that the Supreme Court has recognized such a distinction in the context of *regulatory* takings. *See, e.g.*, *Mugler v. Kansas*, 123 U.S. 623, 668–69

7

(1887) (distinguishing between "the state's power of eminent domain"—under which "property may not be taken for public use without compensation"—and state's "police powers"—which are not "burdened with the condition that the state must compensate [affected] individual owners for pecuniary losses they may sustain"). But the Lechs suggest this distinction is not dispositive in the context of *physical* takings. *Compare Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005) (describing physical takings as "direct government appropriation or physical invasion of private property"), *with id.* at 539 (describing regulatory takings as "regulatory actions that are functionally equivalent" to physical takings). Specifically, the Lechs maintain that *any* "physical appropriation of [private] property" by the government—whether committed pursuant to the power of eminent domain or the police power—"gives rise to a *per se* taking" and thus requires compensation under the Takings Clause. Aplt. Br. 9.

But contrary to the Lechs' position, at least three of our sibling circuits and the Court of Federal Claims have expressly relied upon the distinction between the state's police power and the power of eminent domain in cases involving the government's direct physical interference with private property. For instance, in *AmeriSource Corp. v. United States*, the Federal Circuit held that no taking occurred where the government physically seized (and ultimately "rendered worthless") the plaintiff's pharmaceuticals "in connection with [a criminal] investigation" because "the government seized the pharmaceuticals in order to enforce criminal laws"—an action the Federal Circuit said fell well "within the bounds of the police power."

8

525 F.3d 1149, 1150, 1153–54 (Fed. Cir. 2008) (citing *Bennis v. Michigan*, 516 U.S. 442, 443–44, 452–53 (1996)); *see also, e.g.*, *Zitter v. Petruccelli*, 744 F. App'x 90, 93, 96 (3d Cir. 2018) (unpublished) (relying on distinction between power of eminent domain and police power to hold that no taking occurred where officials physically seized plaintiff's oysters and oyster-farming equipment (citing *Bennis*, 516 U.S. at 452)); *Johnson v. Manitowoc Cty.*, 635 F.3d 331, 333–34, 336 (7th Cir. 2011) (relying on distinction between power of eminent domain and police power to hold that no taking occurred where authorities physically damaged plaintiff's home (citing *Bennis*, 516 U.S. at 452)); *Bachmann v. United States*, 134 Fed. Cl. 694, 696 (Fed. Cl. 2017) (holding that "[w]hen private property is damaged incident to the exercise of the police power, such damage"—even when physical in nature—"is not a taking for the public use, because the property has not been altered or turned over for public benefit" (citing *Nat'l Bd. of Young Men's Christian Ass'ns v. United States*, 395 U.S. 85, 92–93 (1969))).

Further, although the Supreme Court has never expressly invoked this distinction in a case alleging a physical taking, it has implicitly indicated the distinction applies in this context. *See, e.g.*, *Bennis*, 516 U.S. at 443–44, 453–54 (rejecting plaintiff's Takings Clause claim where state court ordered vehicle "forfeited as a public nuisance" without requiring state to compensate plaintiff, who shared ownership of vehicle with her husband; reasoning that when state acquires property "under the exercise of governmental authority *other than the power of eminent domain*," government is not "required to compensate an owner for [that]

9

property" (emphasis added));[7] *Miller v. Schoene*, 276 U.S. 272, 277, 279–80 (1928) (rejecting constitutional challenge to statute that allowed state to condemn and destroy "cedar trees infected by cedar rust," even though statute did not require state to compensate owners for any trees it destroyed; characterizing statute as valid "exercise of the police power").[8]

And we have likewise implicitly treated the distinction between the police power and the power of eminent domain as dispositive of the taking question, even when the interference at issue is physical, rather than regulatory, in nature. For instance, in *Lawmaster v. Ward*, we held that the plaintiff failed to establish a Takings Clause violation where federal agents physically damaged his property—by, for example, tearing out door jambs and removing pieces of interior trim from his

---

[7] In *Bennis*, the Court did not expressly characterize the forfeiture action as a use of the state's police power. But the Court has previously described forfeitures in this manner. *See, e.g.*, *Van Oster v. Kansas*, 272 U.S. 465, 467 (1926) ("[A] state in the exercise of its police [power] may forfeit property . . . ."). Further, in *Bennis*, the Court noted that the state's actions were motivated by its desire to "deter illegal activity that contributes to neighborhood deterioration and unsafe streets." 516 U.S. at 453. And these are classic markers of the state's police power. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) ("Throughout our history the several [s]tates have exercised their police powers to protect the health and safety of their citizens."). Finally, other courts have interpreted *Bennis* as a police-power case. *See, e.g.*, *Rhaburn v. United States*, 390 F. App'x 987, 988 (Fed. Cir. 2010) (unpublished) ("In *Bennis* . . . [t]he Court ruled that no taking had occurred, relying on the nature of the government power exercised to take the property, *i.e.*, the police power.").

[8] The nature of the plaintiffs' constitutional claim in *Miller* is not entirely clear from the Court's language. But the Court has repeatedly cited *Miller* as part of its Takings Clause jurisprudence. *See, e.g.*, *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 490 (1987) (characterizing *Miller* as "holding that the Takings Clause did not require the State of Virginia to compensate the owners of cedar trees for the value of the trees that the [s]tate had ordered destroyed").

10

home—while executing a search warrant. 125 F.3d 1341, 1344–46, 1351 (10th Cir.

1997). In doing so, we reasoned that the plaintiff "fail[ed] to allege any facts showing

how his property was taken for public use." *Id.* at 1351. And although we did not

expressly note as much in *Lawmaster*, we have previously equated the state's power

to "take[] property for public use" with the state's power of eminent domain, as opposed

to its police power. *Lamm v. Volpe*, 449 F.2d 1202, 1203 (10th Cir. 1971) ("Police power

should not be confused with eminent domain, in that the former controls the use of

property by the owner for the public good, authorizing its regulation and destruction

without compensation, whereas the latter takes property for public use and compensation

is given for property taken, damaged[,] or destroyed.").[9] Thus, by holding that the

plaintiff in *Lawmaster* could not show a Fifth Amendment violation because he failed to

show "how his property was taken for public use," we implicitly held his Takings

Clause claim failed because he could not show the government acted pursuant to its

power of eminent domain, rather than pursuant to its police power. 125 F.3d at 1351;

*see also McKenna v. Portman*, 538 F. App'x 221, 223–24 (3d Cir. 2013)

(unpublished) (relying in part on *Lawmaster* to hold that because defendants

exercised state's police power—rather than power of eminent domain—when they

seized plaintiffs' property pursuant to search warrant and subsequently damaged it,

defendants "did not engage in a 'taking' under the Fifth Amendment").

---

[9] Notably, although the defendants discuss *Lamm* in their response brief, the Lechs do not address it in their reply brief.

Nevertheless, despite these persuasive authorities, the Lechs urge us to disregard the distinction between the police power and the power of eminent domain in resolving this appeal. In support, they point out that "the Takings Clause 'was designed to bar [g]overnment from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" Aplt. Br. 13 (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)). And they argue that upholding the district court's summary-judgment ruling would do just that: it would force the Lechs to bear alone the cost of actions the defendants undertook in an effort to "apprehend[] a criminal suspect"—actions that were clearly "for the benefit of the public" as a whole. *Id.* at 13, 33.

We do not disagree that the defendants' actions benefited the public. But as the Court explained in *Mugler*, when the state acts to preserve the "safety of the public," the state "is not, and, consistent[] with the existence and safety of organized society, cannot be, burdened with the condition that the state must compensate [affected property owners] for pecuniary losses they may sustain" in the process. 123 U.S. at 669. Thus, "[a]s unfair as it may seem," the Takings Clause simply "does not entitle all aggrieved owners to recompense." *AmeriSource Corp.*, 525 F.3d at 1152, 1154.

Accordingly, we reject the Lechs' first broad challenge to the district court's ruling and hold that when the state acts pursuant to its police power, rather than the power of eminent domain, its actions do not constitute a taking for purposes of the Takings Clause. And we further hold that this distinction remains dispositive in cases that, like this one, involve the direct physical appropriation or invasion of private

12

property. But that does not end the matter. We must next determine whether, as the district court ruled, the defendants acted pursuant to the state's police power here.

## II. Law Enforcement and the Police Power

"[T]he police power encompasses 'the authority to provide for the public health, safety, and morals.'" *Dodger's Bar & Grill, Inc. v. Johnson Cty. Bd. of Cty. Comm'rs*, 32 F.3d 1436, 1441 (10th Cir. 1994) (quoting *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 569 (1991)). The "contours of [the police power] are difficult to discern." *AmeriSource Corp.*, 525 F.3d at 1153. But as discussed above, we have described the police power in contrast to the power of eminent domain: "the former controls the use of property by the owner for the public good," while the latter "takes property for public use." *Lamm*, 449 F.2d 1203.

The parties have not pointed us to any Tenth Circuit authority that affirmatively resolves whether the defendants' conduct here damaged the Lechs' home for the public good or for public use. But the Court of Federal Claims has applied this distinction to facts that are nearly identical to those at issue here. *See Bachmann*, 134 Fed. Cl. 694. In *Bachmann*, the United States Marshals Service "used gunfire, smoke bombs, tear gas, a battering ram, and a robot to gain entry" to the plaintiffs' rental property, which—unbeknownst to the plaintiffs—had become a hideout for a fleeing fugitive. *Id.* at 695. The plaintiffs then sued the Marshals Service, alleging the damage to their property constituted a taking under the Fifth Amendment. *Id.* The Marshals Service moved to dismiss, arguing that because it acted under the police power, any damage it caused to the

13

plaintiffs' property in the process "could not amount to a compensable Fifth Amendment taking." *Id.*

Relying in large part on the Federal Circuit's decision in *AmeriSource*, the Court of Federal Claims agreed with the Marshals Service and granted the motion to dismiss. *Id.* at 695–97 (citing *AmeriSource*, 525 F.3d at 1153–55). Critically, in doing so, it rejected the plaintiffs' argument that "when law enforcement officials damage private property in the process of enforcing criminal law, they . . . take private property for public use." *Id.* at 695. Instead, the court reasoned, the Marshals Service damaged plaintiffs' property while "us[ing] perhaps the most traditional function of the police power: entering property to effectuate an arrest or a seizure." *Id.* at 697. Thus, the court concluded, the plaintiffs did not suffer "a taking of their property for public use," and their Fifth Amendment claim failed as a result. *Id.* at 698.

Notably, in reaching this conclusion, the Court of Federal Claims addressed the potential distinction between (1) cases in which "law enforcement officials seize and retain [personal] property as the suspected instrumentality or evidence of a crime" and (2) cases in which government officials inflict damage to real property that is "incidental to the exercise of the police power." *Id.* at 696–98. And the Lechs attempt to invoke the same distinction here: they argue that although the police power encompasses the seizure of personal property that is "caught up in criminal activity" or is "evidence of a crime," it does not encompass "the destruction of an entire home in furtherance of apprehending an uncooperative suspect." Aplt. Br. 21–22. But like the Court of Federal Claims, we see no "principled reason" to draw such a distinction. *Bachmann*,

14

134 Fed. Cl. at 698. Indeed, just like the house at issue in *Bachmann*, the Lechs' home "had become instrumental to criminal activity"—it was serving as a hideout for a fugitive. *Id.* at 697. Thus, just as in *Bachmann*, "the damage caused in the course of arresting a fugitive on plaintiffs' property was not a taking for public use, but rather it was an exercise of the police power." *Id.*

The Lechs resist this approach, insisting that if we define the police power broadly enough to encompass conduct like the type at issue here and in *Bachmann*, it will amount to a "federally unprecedented expansion" of that power. Aplt. Br. 26. In support, the Lechs first insist that the police power encompasses only the state's "power to *establish* laws"—as opposed to the power to "enforce[]" those laws. Aplt. Br. 28. Yet the Lechs expressly concede elsewhere in their brief that the police power encompasses the power "to make *and enforce* laws." Aplt. Br. 30 (emphasis added). And caselaw supports this concession. *See, e.g.*, *AmeriSource Corp.*, 525 F.3d at 1153 ("The government's seizure of property *to enforce criminal laws* is a traditional exercise of the police power that does not constitute a 'public use.'" (emphasis added) (citation omitted)). Thus, we reject the Lechs' effort to limit the police power to actions that establish law, rather than merely enforce it.

We likewise reject the Lechs' assertion that the police power does not encompass the state's ability to seize property from an *innocent* owner. This argument is not without support. *See, e.g.*, *Wegner v. Milwaukee Mut. Ins. Co.*, 479 N.W.2d 38, 41–42 (Minn. 1991) (holding that where "innocent third party's property [was] damaged by the police in the course of apprehending a suspect," such damage was inflicted "for a public use").

15

Nevertheless, despite "the considerable appeal of this position as a matter of policy," we join the Federal Circuit in rejecting this argument as a matter of law. *AmeriSource Corp.*, 525 F.3d at 1154–55 ("[S]o long as the government's exercise of authority was pursuant to some power other than eminent domain, then the plaintiff has failed to state a claim for compensation under the Fifth Amendment. The innocence of the property owner does not factor into the determination." (citation omitted) (citing *Bennis*, 516 U.S. at 453)).

Finally, contrary to the Lechs' position, we see no indication that defining the police power broadly enough to encompass the defendants' actions in this case will signal to police they may "act with impunity to destroy property" or deprive them of "reason to limit the destruction" they cause simply "because they will not bear the burden of the cost and will be absolved of any responsibility" for their actions. Aplt. Br. 31. This argument overlooks *other* limits placed on the police power. Indeed, even the Lechs concede that the police power is subject to the requirements of the Due Process Clause. *See Lambert v. California*, 355 U.S. 225, 228 (1957); *AmeriSource*, 525 F.3d at 1154 ("As expansive as the police power may be, it is not without limit. The limits, however, are largely imposed by the Due Process Clause."); *Lowther v. United States*, 480 F.2d 1031, 1033–34 (10th Cir. 1973) (holding that where government "destroyed appellee's property without having any authority in law to do it," its actions were "contrary to the [D]ue [P]rocess [C]lause of the Fifth Amendment"). And as the defendants point out, police officers who willfully or wantonly destroy property may also be subject to tort liability. *See, e.g.*, Colo. Rev. Stat. § 24-10-118(2)(a).

16

**Conclusion**

Because (1) the defendants' law-enforcement actions fell within the scope of the police power and (2) actions taken pursuant to the police power do not constitute takings, the defendants are entitled to summary judgment on the Lechs' Takings Clause claims. We therefore affirm the district court's ruling.

Entered for the Court


Nancy L. Moritz
Circuit Judge